IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2016

**IN RE JOHN J.**[1]

**Appeal from the Juvenile Court for White County**
**No. 4151, JV820     Sam E. Benningfield, Jr., Judge**

_____

**No. M2016-01136-COA-R3-PT – Filed February 17, 2017**

_____

This is an appeal from an order terminating a Mother's parental rights to her son. The Department of Children's Services filed a petition to have the child declared dependent and neglected when he was observed with burn marks on his thigh and fingers. He was adjudicated to be dependent and neglected, and custody was given to the Department. A petition to terminate Mother's parental rights was subsequently filed and, following a trial, the court held that Mother had abandoned the child by failing to visit him and by engaging in behavior which exhibited a wanton disregard for the child's welfare; the court also determined that termination of Mother's rights was in the child's best interest. Mother appeals, contending that the court erred in holding that termination of her rights was in the child's best interest. After a thorough review of the record, we affirm the judgment of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Kelsey Austin Miller, Cookeville, Tennessee, for the appellant, Karrie S., also known as Karrie N.

Herbert H. Slatery, III, Attorney General and Reporter; Alexander S. Rieger, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

John J. was born in November 2006 to Karrie S. ["Mother"] and Casey J.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

["Father"]. The Department of Children's Services ["DCS"] received a referral on August 13, 2013, that John J. had burn marks from a cigarette on his inner thigh and fingers that were allegedly inflicted by Mother; at the time, Father was incarcerated. Pursuant to a petition filed by DCS on August 26, 2013 to have John J. declared dependent and neglected, a Kinship Protective Custody Order was entered in Juvenile Court of White County on August 27, in which John J. was brought into the protective custody of the court and placed with his maternal great-grandmother. The order was entered pending the preliminary hearing on DCS's petition to adjudicate John J. dependent and neglected. On September 5, a preliminary hearing order was entered, continuing the hearing on DCS's petition and granting temporary custody of John J. to his paternal grandparents, effective September 3.

The hearing on the petition was held on October 8, 2013. Each parent stipulated that John J. was dependent and neglected, and by order entered October 10, he was so adjudicated. The order continued John J.'s placement with his paternal grandparents. In March 2014, based upon an incident with the paternal grandparents, DCS filed a petition for temporary legal custody of John J. and the court ordered him to be placed in foster care on March 18, where he has remained.[2] In April 2014, Mother was incarcerated and in August 2014 her probation on an eight year sentence imposed for a prior conviction was revoked; she remained incarcerated at the time of trial but was present in court during the termination hearing.

On June 12, 2015, DCS filed a petition to terminate Mother and Father's parental rights to John J. on the grounds of abandonment by willful failure to visit or support in the four months preceding their incarceration and abandonment by wanton disregard for the welfare of the child, pursuant to Tennessee Code Annotated section 36-1-116(g)(1); -

---

[2] The following allegation was contained in the petition for temporary custody of John J.:

> A home study was completed on paternal grandparents, Buel and Sarah J[.], and temporary custody of [John J.] was placed with them, pursuant to a court order. This placement prevented foster care and allowed [John J.] to live with his grandparents, with whom he already had an existing relationship. In January 2014, the J[.]'s granddaughter, Jessica J[.], gave birth to Kurtis M[.] and the baby tested positive for meth and other substances. DCS removed Kurtis from his mother and this child was also placed with Buel and Sarah J[.]. On February 23, 2014, Child Protective Services Investigator (CPSI) Karla Yates was in White County Court and saw the J[.]s. The J[.]s did not have Kurtis with them and CPSI Yates asked them who had the baby. Sarah J[.] was very evasive and at first would not answer Ms. Yates. She then said that her daughter Lesley E[.] was keeping Kurtis. CPSI Yates investigated the situation and found that Kurtis was left unsupervised with his parents Jessica J[.] and Tracey M[.] while Buel and Sarah J[.] attended court. Kurtis was removed from the J[.]'s care and entered State's custody. Due to the situation with Kurtis M[.] and the Court's inquiry into the situation at the 3-11-14 review hearing, the Department cannot articulate any reasons to leave "[John J.]" in the care and custody of Buel and Sarah J[.]. No other family members are appropriate for placement of [John J.].

102(1)(A)(iv).[3]  The trial was held on April 15, 2016, at which the following witnesses testified: Mother, Father, DCS case manager Felicity Lankford, DCS case manager Jamesia Evans, and Claire Timland, a supervisor at Youth Villages, where John J. received counseling services while he was in foster care.  The court issued an oral ruling at the conclusion of the trial, and a "Final Decree of Guardianship" was entered on May 12, 2016, terminating the parental rights of both parents on the ground of abandonment by wanton disregard and of Mother on the ground of abandonment by willful failure to visit, and upon a finding that termination of both parents' rights was in the child's best interest.

Mother appeals,[4] articulating the following issues for our review:

1. Whether the Department of Children's Services provided reasonable efforts to the Mother, or in the alternative whether the Department of Children's Services should be relieved of reasonable efforts upon the incarceration of a parent.

2. Whether the Trial Court erred in determining there was clear and convincing evidence that the termination of Mother's parental rights was in the best interest of the minor Child.

## II.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).  However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W3d 586, 589 (Tenn. Ct. App. 2004).  The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004).  Thus, parental rights may be terminated only where a statutorily defined ground exists. Tennessee Code Annotated section 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).  To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

---

[3] An amended petition was filed on August 25, alleging as an additional ground for terminating Father's rights that he had been incarcerated under a sentence of 10 or more years when the child was under the age of 8, pursuant to Tennessee Code Annotated section 36-1-113(g)(6).

[4] Father does not appeal the trial court's decision terminating his rights to John J. and is not a party to this proceeding.

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766-69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tennessee Code Annotated section 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## III. ANALYSIS

### A. Grounds for Termination

Mother does not challenge the court's holdings that the grounds for termination were established by the proof. Nevertheless, mindful of the instruction set forth by our Supreme Court that, "in an appeal from an order terminating parental rights[,] the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal," we proceed to address the sufficiency of the evidence to support the grounds for termination. *In Re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), *cert. denied sub nom. Vanessa G. v. Tennessee Dep't of Children's Servs.*, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016) (footnote omitted).

As grounds for termination of Mother's rights, the petition asserted abandonment by willful failure to visit, by willful failure to support, and by engaging in conduct exhibiting a wanton disregard for the welfare of John J. The trial court made several factual findings relating to its determination that DCS had established that Mother abandoned John J. and held:

> [T]he Respondent, [Mother], has willfully abandoned the minor child for more than four (4) consecutive months prior to her incarceration; that she failed to visit in the four months prior to her incarceration; that prior to incarceration she engaged in conduct exhibiting a wanton disregard for the welfare of the child; . . . . [5]

---

[5] The trial court made a finding that Mother had failed to support John J., and that despite her awareness

4

Abandonment is identified as a ground for termination in Tennessee Code Annotated section 36-1-116(g)(1) and is defined in section 36-1-102(1)(A), which reads in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> ***
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).[6]

Evidence relating to Mother's visitation with John J. consisted of her testimony as well as that of Ms. Lankford. Mother testified that she had been incarcerated since April 11, 2014; that she had visited with John J. on one occasion in February 2014; that during her visits, she bought John. J. "food, drinks" and "would usually go to the Dollar Store

---

of her duty to do so, Mother had only provided token support. It is not clear why this finding was not carried forward into the court's ultimate holding. From our review of the record, the finding is supported by Mother's testimony that she did not pay any child support, which provides clear and convincing evidence that Mother also abandoned John J by failing to support him in the four months prior to her incarceration.

[6] Pursuant to section 36-1-102(1)(A)(iv), it is the four-month period "immediately preceding" Mother's incarceration that is relevant to a determination of whether she abandoned John J. Mother testified that she had been incarcerated since April 11, 2014 through the time of trial; thus the period from December 11, 2013 to April 10, 2014 is the relevant period. At various points in the record, the court and counsel for DCS reference a four-month period from September 2013 to January 2014. It is not readily apparent from the record why each deem this period to be relevant; however, no party raises an issue with respect to the applicable four-month period. For purposes of this appeal, we consider the period December 11, 2013 to April 11, 2014 to be the applicable period.

and buy him a toy or whatever, coloring books, balls";[7] that between February and April 2014, she talked to him a couple of times when he was in foster care.

Felicity Lankford, the DCS case manager who worked with John J.'s family from August 2013 until March of 2014, testified that Mother was not in jail during that time; that she "had trouble contacting [Mother] and locating her . . . [w]e just had trouble trying to get in touch with her"; that she set up two visits for Mother in February 2014, neither of which took place,[8] and that she was not aware of any visits Mother had with John J.

While Mother testified that she had one visit in February 2014, Ms. Lankford testified that there were no visits at any time. Construing this evidence in favor of Mother, however, it shows that Mother engaged in no more than token visitation with the meaning of Tennessee Code Annotated section 36-1-102(1)(C)[9] in the relevant period and supports the court's determination that Mother abandoned John J. by willfully failing to visit during the four months preceding her incarceration.

Evidence relating to Mother's conduct exhibiting a wanton disregard for John J.'s welfare prior to incarceration consisted of her testimony and the records of her convictions. Mother testified that she was convicted of possession of drug paraphernalia in November 2008; that in August 2010, she was convicted of criminal impersonation and delivery of more than half a gram of methamphetamine, for which she was given an eight year sentence to be served on probation; that in October 2012, she plead guilty to simple possession of a Schedule VI controlled substance; that her probation was revoked on August 11, 2014 for "driving on suspended [license] and theft under [$]500." Mother also testified that she was aware that she had a duty to support John J. but could not do so due to her drug and alcohol addiction; that she previously "s[old] drugs to make money"; and that prior to her incarceration, she drank six to twelve beers a day since she was 15, used methamphetamines off and on since she was 18 and was using daily prior to her incarceration, and abused prescription drugs by taking five to six Xanax a day since she was 29.[10] The order adjudicating John J. dependent and neglected also recites that

---

[7] It is not clear from the record when the visits Mother refers to occurred.

[8] Ms. Lankford testified that one visit did not take place because John J. had gotten in trouble at school and "had to stay over"; she did not testify as to the reason the other visit did not take place.

[9] Tennessee Code Annotated section 36-1-102(1)(C) states:

> For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]

[10] The records of Mother's convictions contain her birthdate; they show that she was 33 at the time of trial.

Mother was involved in a domestic altercation with a paramour who lived in the home who had struck her and pushed her down; that paramour had been previously arrested for domestic assault.

There is clear and convincing evidence supporting the court's factual findings and its holding that Mother abandoned John J. by exhibiting wanton disregard for his welfare.

Accordingly, we affirm the trial court's holding that Mother abandoned John J. by failing to visit him in the four months preceding her incarceration and by engaging in conduct that exhibits a wanton disregard for his welfare.

## B. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The Legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[11] The list of factors in the statute "is not exhaustive, and the statute

---

[11] The factors at Tennessee Code Annotated section 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe

does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue, we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

The court made findings of fact as to factors (4), (5), and (9) in holding that termination of Mother's parental rights was in the best interest of John J. Mother does not take issue with the specific findings but argues that, because DCS did not provide "reasonable efforts," the court erred in holding that termination of her rights was in John J.'s best interest.

With respect to factor (4), the court found:

> A meaningful relationship has not otherwise been established between the child and [Mother] and [Father]. The child's focus in terms of his parents was focused on his grandparents. In the child's mind, his parents were his grandparents. Tenn. Code Ann. § 36-1-113(i)(4) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

In addition to the testimony regarding Mother's visitation discussed in Section A of this opinion, Mother provided the following testimony relative to communications she sent to John J.:

> Q.: Have you tried to communicate with your son while you've been in prison?
> A.: Yes, I have.
> Q.: How did you try to do that?

---

and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

8

A.: Whenever I got in Family Reunification I wrote Jamecia [Evans] and asked her about getting contact with my son. She said to send all correspondence though her. So I've been sending him stuff, like, two or three times a month and I send it to the DCS office here in Sparta. I talked to her, I think it was September 2014, and I asked her about this stuff and she said that she had been putting in in a file. I think she gave him one thing I sent. But she's been putting it in a file instead of giving it to him. I've also sent a petition to the court. I might have put the wrong names on it, I just realized.

Testimony relating to this factor was also given by Ms. Jamecia Evans, the caseworker who succeeded Ms. Lankford in March of 2014. She testified that she had received a few letters addressed to John J. from Mother; that she initially gave the letters to John J., but decided to give them to his Youth Villages counselor who could determine whether "they were appropriate for his mental health diagnosis." Ms. Evans also testified that when she spoke with John J. about his parents, he "didn't want to talk about his parents. It was about his grandparents." When asked if John J. had ever shown an interest or desire to be placed with his mother and father, Ms. Evans testified that "[John J.] said that if he could he would like to live with his dad, but he really wanted to be back with his nanny and his poppa."

Ms. Evans' testimony is telling. At the time of trial in April 2016, John J. was nearly ten years old and had been in DCS custody since August of 2103. According to Ms. Evans, he expressed no interest or desire to be placed with his Mother but, rather preferred to be placed with his grandparents. Taken as a whole and in context, the entire testimony supports the finding that John J. did not have a meaningful relationship with Mother.

As to factor (5), the court found:

A change of caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological and/or medical condition. The child is diagnosed with ADHD and ODD and he needs a consistent and structured environment. Tenn. Code Ann. § 36-1-113(i)(5) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

This finding is also supported by clear and convincing evidence, specifically the testimony of Ms. Evans that John J. was diagnosed in the summer of 2014 with Oppositional Defiance Disorder for which he has to take medication; that he has also been diagnosed with ADHD; that he needs the structured environment which he receives in the home of his foster parents; that he has been in the current foster home since February 2015, where his foster parents take him horseback riding and outdoors to

"facilitate trying to maintain [John J.] being able to be active and exert the energy that causes him to sometimes act out"; that his foster father is "a stay-at-home dad, so he's always accessible to J[ohn J.]"; and that he is making straight A's in school.

As to factor (9), the court found:

[Mother] and [Father] have not paid child support consistently with the child support guidelines promulgated by the Department pursuant to Tenn. Code Ann. § 36-5-101. T.C.A. 36-1-113(i)(9) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

This finding is supported by Mother's testimony that she was aware that she had a duty to support her child, but that she did not pay any support due to her drug and alcohol addiction. Additionally, Ms. Evans testified that neither parent had, to her knowledge, paid child support for John J.

The trial court also made the following findings:

31. The child has established a strong bond with the foster parents.

32. The Court finds that time is of the essence in this case and that it is unclear when [Father] will be released, and that, at best, [Mother] will not be released for another year. It is unfair to the child who has already been in foster care for approximately two years. It is unfair for the child to not know for another year or so if he is going to move again. The child is in a place where he is succeeding. There is a real chance for permanency for this child. The child's interest in permanency, at this point, outweighs the parents' rights.

The findings in paragraphs 31 and 32 are supported by the testimony of Ms. Evans that John J. has been in the current foster home since February 2015 and "has adjusted very well and [is] very bonded to both foster parents and his foster brother." In addition, Mother testified that that she recently "made parole with completion of a TC program, which is a drug program" that will take seven to eight months to complete; that her parole is conditioned upon her going to a half-way house upon release from prison and successfully completing the program; that one half-way house where she'd been accepted has a mother and child program, "where after you get to a certain phase you have your own apartment and your child can live with you there in the program"; that it takes three months to get through the initial phase before John. J. could come live with her; and that she needed housing and a job before she can be a parent.

10

The record is clear that John J. is succeeding in the foster home, is making straight A's, is bonded to the foster family and getting the structured environment he needs, and that the family is interested in adopting him. The findings of the court as to the statutory factors are supported by clear and convincing evidence.

The issues raised by Mother in her appeal both pertain to the holding that termination of her rights was in John J.'s best interest. Mother first argues that "a termination of parental rights is improper in this case, due to the complete lack of efforts, let alone reasonable efforts, of DCS." Secondly, Mother argues that "there is a lack of evidence that would indicate that the Child could not be integrated into the Mother's new lifestyle, or at least placed with family" and that "due to the fact that the Child has extended family available, and due the Department's lack of reasonable efforts, the trial court erred in determining that termination was in the minor Child's best interest."[12] We shall address each argument in order.

Mother begins the discussion of her first argument with the statement: "The Department of Children's Services did not provide reasonable efforts, and therefore, a termination of parental rights of the Mother is inappropriate." Mother does not identify the basis of the obligation she contends that DCS had or the objective of any such efforts. In this regard, we note that DCS included noncompliance with the permanency plan, as specified in Tennessee Code Annotated section 36-1-113(g)(2), as a ground for termination of Mother's rights. The trial court held that DCS had not met its burden of proof on this ground and, consequently, did not base the termination of Mother's rights on this ground; DCS has not appealed that determination. Accordingly, as more fully explained below, we review DCS' efforts in the context of the determination as to whether termination of Mother's rights was in John J.'s best interest.

In *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015), our Supreme Court considered the relationship between the reasonable efforts requirement under Tennessee Code Annotated section 37-1-166[13] and section 36-1-113, the statute governing termination of parental rights. Following a lengthy discussion of the relevant statues and their legislative history, as well as cases addressing reasonable efforts in the context of

---

[12] Mother does not support either argument with citations to the record. *See* Rule 27(a)(7)(A) of the Tennessee Rules of Appellate Procedure; Rule 6(a)(4) of the Rules of the Tennessee Court of Appeals.

[13] Tennessee Code Annotated section 37-1-166 governs proceedings in Juvenile Court to have a child committed to or retained in DCS custody; subsection (a) states that:

> (a) At any proceeding of a juvenile court, prior to ordering a child committed to or retained within the custody of the department of children's services, the court shall first determine whether reasonable efforts have been made to:
> (1) Prevent the need for removal of the child from such child's family; or
> (2) Make it possible for the child to return home.

11

termination of parental rights, the court overruled the cases which held that proof of DCS's reasonable efforts was required to terminate paternal rights and held:

> For these reasons, we hold that, in a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.,* 182 S.W.3d [838] at 861 [(Tenn. Ct. App. 2005)]. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *See In re Adoption of Kleshinski,* No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005) (citing *In re M.J.B.,* 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *see also In re Giorgianna H.,* 205 S.W.3d [508] at 516 [(Tenn. Ct. App. 2006)]; *Tenn. Dep't of Children's Servs. v. T.M.B.K.,* 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

> * * *

> In a given parental termination case, the best-interest factor regarding DCS's efforts to assist the respondent parent may be determinative, i.e., DCS's lack of reasonable efforts may weigh heavily enough to persuade the trial court that termination of the parent's rights is not in the best interest of the subject child. Nevertheless, the extent of DCS's efforts remains a factor to be weighed in the best-interest analysis, not an essential element that must be proven in order to terminate the parental rights of the respondent parent. *See In re B.S.G.,* No. E2006-02314-COA-R3-PT, 2007 WL 1514958, at *9 (Tenn. Ct. App. May 24, 2007).

455 S.W.3d at 555-56 (Tenn. 2015).

As noted *supra*, footnote 8, Tennessee Code Annotated section 36-1-113(i)(2) includes "reasonable efforts by available social services agencies" as a consideration, where applicable, in the best interest determination. The record before us contains some of the pleadings and orders entered in the dependent and neglect proceeding, including an Annual Permanency Hearing Order, entered March 2, 2015, in which the court found that DCS "is making reasonable efforts toward finalizing the permanency goal by providing or referring the following [services]" and identifying: mental health counseling for child; drug and alcohol assessment for parents; hair follicle drug screens for parents; psychological evaluation for the child; intensive in-home case management; assistance

with transportation; locating or placement with relative; locating or placement in a pre-adoptive home; and arranged grandparent visitation with John J. The order further notes that:

> 6. Compliance with the current permanency plan is as follows:
>     a. the Department of Children's Services is in substantial compliance;
>     b. the mother is not in substantial compliance in that she is in prison under a lengthy sentence and unable to complete her plan.

The record also contains an Affidavit of Reasonable Efforts signed by Ms. Evans, which recites that "DCS has been involved with this family since August 2013 . . . [t]he parents have been substantially non-compliant"[14]; that on May 27, 2014, Ms. Evans visited Mother in the Van Buren County Jail and asked Mother to contact her when she was released; that Ms. Evans visited Mother in the White County Jail in July and August, 2014; that on January 5, 2015, Ms. Evans went to the White County Justice Center to see if Mother was still incarcerated and was informed that Mother was released on November 25, 2014; that Ms. Evans later learned that Mother was in the Tennessee Women's Prison in Nashville; that in March 2016, Ms. Evans contacted three halfway houses on behalf of Mother and one responded; Ms. Evans sent an application to Mother for a halfway house Mother hoped to enter after parole called Mending Hearts and sent Mother's completed application to Mending Hearts.

Ms. Evans also testified at trial with respect to her efforts to provide services to John J. and his family, including her trips to the prison to visit Mother; that she inquired about services that came to the jail but discovered that there were no programs or in-jail services available to Mother in the White County or Van Buren County jails; that when Mother was sent to the Tennessee Prison for Women in November 2014, she was informed that Mother was potentially eligible for parole on two occasions and, at the request of Mother's counsel, obtained an application for Mending Hearts. She also testified that Mother sent her three certificates of completion, but not all certificates from the many classes Mother completed while incarcerated.[15]

---

[14] Ms. Evans attested that on November 5, 2013, Mother knew of but did not attend a meeting at the DCS office in Sparta; that on November 26, 2013, DCS case manager Felicity Lankford visited the home and school and was unable to contact Mother via telephone; that Mother contacted Ms. Lankford on December 5 and 10, 2013, and agreed to send an address but failed to do so.

[15] Mother testified that she initiated getting into the programs that she completed while incarcerated. Included in the record are Mother's certificates of completion for the following courses:

- Group Therapy Substance Abuse/Anger Management
- "Kids are Worth It!" Parenting Class
- Victim Impact Program

Mother testified that she had failed to stay in touch with the case manager as she should have; that she received a report on the child's foster care "every now and then" and spoke with her DCS case worker one time, in September 2014. Mother testified that she was offered drug treatment when DCS became involved, but could not pay for it, and that it was not discussed with her whether DCS would pay for the treatment; that she has written to the case worker while incarcerated and petitioned the court asking for contact with her child but has not heard from either.

The order terminating Mother's rights does not contain a specific finding with respect to Tenn. Code Ann. § 36-1-113(i)(2); however, in its oral ruling at the end of the trial, the court found that "the efforts the state made, throughout this course, and particularly regarding the termination, have been reasonable."[16] The proof supports a finding that DCS made reasonable efforts since August 2013 when it first became involved with the family to assist Mother and Father in addressing the factors which led to John J.'s removal, and Mother's contentions to the contrary are unfounded.

With respect to her second argument, Mother does not take issue with the trial court's findings that "[t]he child is diagnosed with ADHD and ODD and he needs a consistent and structured environment," or that:

> The Court finds that time is of the essence in this case and that it is unclear when [Father] will be released, and that, at best, [Mother] will not be released for another year. It is unfair to the child who has already been in foster care for approximately two years. It is unfair for the child to not know for another year or so if he is going to move again. The child is in a place where he is succeeding. There is a real chance for permanency for this child. The child's interest in permanency, at this point, outweighs the parents' rights.

---

- Thinking for a Change
- Anger Management
- Employment Readiness
- Venture In Spiritual Practices, Masterlife Discipleship Training
- Family Reunification Program
- Pro-Social Life Skills
- Cognitive Orientation

[16] In the Adjudicatory and Dispositional Hearing Order issued October 10, 2013, entered as an exhibit at the termination hearing, the court found that reasonable efforts had been made to prevent the removal of John J. from his home, and that "[r]easonable efforts have been made to assist the parents in remedying the conditions that necessitate foster care." The court did not relieve DCS of its duty to provide those services.

Mother does not cite to any proof in support of her argument that she has "extended family available" or that John J. could be "integrated to Mother's new lifestyle." As noted earlier in this opinion, John J.'s foster family provides a presently available, stable and supportive environment, which stands in contrast to the uncertain environment Mother may be able to provide at some point in the future. In addition, Ms. Evan's testimony belies Mother's assertion that extended family is available to care for John. J.[17]

As we consider Mother's argument, we find instructive the reasoning in *In re DNG*, No. M2003-02810-COA-R3-PT, 2004 WL 2314534, at *3 (Tenn. Ct. App. Oct. 13, 2004), that "[e]xpecting a young child to wait years on incarcerated parents to remedy their problems is neither reasonable nor in the best interests of the child" and that "stability is important to a child's well-being." The holding that termination of Mother's rights is in the best interest of John J. is supported by clear and convincing evidence, and Mother's argument to the contrary is without merit.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

RICHARD H. DINKINS, JUDGE

---

[17] Ms. Evans testified as follows about her attempts to place John J. with other family members:

> We were told that we were not going to be able to return to the grandparents. There is no other viable option on [Father's] side. I talked with [Mother's] mother and she said that her husband wouldn't pass a background check, so she refused to even do the foster parent paperwork. We did run expedite on her father. Her father at the time was on multiple medications. I know this myself because I went out there with the expedite worker that went out there. He was on multiple medications. He didn't have the financial means to take JT in. He also said that he didn't have transportation to get JT to and from school or to and from appointments.

The Affidavit of Reasonable Efforts, signed by Ms. Evans, also recites that on February 19, 2016, during a visit with John at school, "John asked about his aunt[,] and FSW Evans told John that because she had a history with DCS the judge would not allow him to go there."

15